Filed 7/9/21  P. v. Smith CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT SMITH,<br><br>    Defendant and Appellant. | D077521<br><br><br>(Super. Ct. No. SCD278842) |


APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Kessler & Seecof and Daniel J. Kessler, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Eric A. Swenson and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Robert Smith guilty of 13 counts of robbery (Pen. Code, § 211),[1] four counts of burglary (§ 459), four counts of grand theft (§ 487, subd. (a)), and two counts of using personal identifying information of another (§ 530.5, subd. (a)). For one of the robbery counts, the jury found that Smith personally inflicted great bodily injury. (§§ 1192.7, subd. (c)(8), 12022.7, subd. (a).) The trial court sentenced Smith to a prison term of 21 years, four months, ordered victim restitution, and imposed certain fines and fees.

Smith presents four contentions on appeal. First, Smith contends that the trial court erred in not sua sponte giving a limiting instruction as to how the jury should treat evidence that Smith may have committed certain uncharged offenses. In the alternative, with respect to that issue, Smith contends defense counsel was ineffective for not requesting such an instruction. Second, Smith argues that his right to due process was violated by language in CALCRIM No. 315 that directs the jury to consider witness certainty when evaluating eyewitness testimony. Third, Smith contends that insufficient evidence supports one of his robbery convictions. Finally, Smith relies on principles of due process to argue that the trial court should be required to hold a hearing on his ability to pay the fines and fees it imposed at sentencing. We conclude that Smith's arguments lack merit, and we accordingly affirm the judgment.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

The charges against Smith arose from a series of robberies and burglaries committed between July and September 2018. At trial, Smith admitted to committing some of the offenses. For the other offenses, Smith either denied being involved, or he admitted that he had some connection with the offenses but denied that he was a perpetrator.

A. *The Crimes Committed Between July and September 2018*

1. *The Burglaries of Apple Stores Admitted by Smith During His Testimony*

We begin with the offenses that Smith admitted at trial. Specifically, Smith admitted that on July 9, July 11, July 13, and August 7, 2018, he committed burglaries of Apple stores in various locations in San Diego County. On each of those dates, Smith and three or four other perpetrators entered an Apple store shortly before closing time and took iPhones and computers that were on display in the store. The value of the stolen items in the different burglaries ranged from approximately $19,000 to approximately $33,000. During one of the burglaries, a loss prevention officer was assaulted, but, according to the victim, Smith was not the burglar who assaulted him. At trial, Smith admitted during cross-examination that he also participated in the burglary of an Apple store in Orange County on July 23, 2018, but that crime was not charged in this case. Smith testified that during the Orange County burglary, he kicked the face of an off-duty police officer.

3

2.    *The Remaining Counts, Which Smith Did Not Admit During His Testimony*

The remaining counts, which Smith did not admit at trial, concern a series of robberies and thefts that occurred between July 7 and September 18, 2018.  We describe the crimes in chronological order.

a.    *The Robbery of Y.S. on July 7, 2018*

On July 7, 2018, college student Y.S. was robbed and assaulted at 1:15 a.m. as he walked through the grounds of his apartment complex.[2] Specifically, a man approached Y.S., accompanied by three other men, and asked to use the cell phone that Y.S. was holding.  When Y.S. offered to make a call for the man rather than hand over the phone, the man grabbed the phone.  Y.S. resisted, and he was assaulted by the men, resulting in injuries.  During the struggle, Y.S. ripped off the beanie hat worn by the man who spoke with him, and he later turned it over to police.

A video on the cell phone of Smith's friend, recorded approximately an hour before the robbery, shows Smith wearing the beanie hat.  Another cell phone video, recorded six minutes after the robbery, shows Smith, who is no longer wearing the beanie hat, holding Y.S.'s iPhone and talking about punching someone.  When Smith testified, he stated that he was not present during the robbery of Y.S., but that he later obtained Y.S.'s phone when he bought it to use as his personal phone, not knowing it was stolen.

b.    *The Robbery of Christopher A. on August 3, 2018*

---

[2]    To protect the privacy of the victims of Smith's crimes, we refer to them either by their initials or their first names, and we intend no disrespect by doing so.

At approximately 10:30 p.m. on August 3, 2018, Christopher A. was walking home from a friend's house when two men came up from behind him, grabbed his iPhone and ran off with it. The phone case contained Christopher's identification card and debit card. When Christopher chased after the man who grabbed his phone, the second man told him to "just keep walking." When Christopher ignored that command, he was punched in the face by the man with the phone and fell to the ground. The men got into a car and left.

Christopher's debit card was used to buy food at Carl's Jr. shortly after the robbery. Surveillance video from Carl's Jr. shows Smith's car at the drive-through window during the purchase. A cell phone video taken at 11:22 p.m. on the night of the robbery shows Smith holding up Christopher's identification card and debit card while he brags about purchasing food with the card. When Smith's car was searched after police stopped it on August 19, 2018, Christopher's identification card was found under the driver's seat. Smith testified at trial that he did not participate in the robbery of Christopher, but that he met his friends at Carl's Jr. to buy food shortly after the robbery, and he was handed Christopher's debit card to make the purchase.

c.  *The Robbery of the Three Marines on August 12, 2018*

Around 1:00 a.m. on August 12, 2018, three members of the U.S. Marine Corps were robbed at gunpoint by a group of men as they walked to their car after a party in Fallbrook. The three Marines had wallets, an iPhone, a watch, a necklace, and a pair of boots taken from them.

A government credit card taken from one of the Marines was used later that night to buy food at a restaurant in Santee called "Canes." A cell phone video taken that night shows Smith's friend in Smith's car saying, "Blood,

5

Canes on me," and holding up one of the Marines' wallet and credit card. Surveillance video from Canes shows Smith's car at the drive-through at 2:24 a.m. Boots of the same brand, style and size stolen from one of the Marines were found in Smith's car when it was searched after being stopped by police on August 19, 2018, as were credit cards belonging to two of the Marines. When Smith testified at trial, he denied being present at the robbery in Fallbrook, but stated that he met his friends at Canes after the robbery, where they gave him a credit card to pay for the meal. He also claimed that the boots found in his car belonged to him.

> d. *The Robberies at the Concert on August 18, 2018*

On August 18, 2018, two different groups of people were robbed during a concert held at the swimming pool area of an apartment complex.

First, a group of three friends, B.R., L.A., and U.R., were approached at the concert by several men, who surrounded them. The men took B.R.'s iPhone and wallet and then assaulted him. L.A. was forced to hand over money during the robbery. Later, as B.R. was walking to the car, a man ran up and snatched the silver and gold chains off his neck.

When Smith's car was searched after being stopped by police on August 19, 2018, B.R.'s medical insurance card was under the front passenger seat. A passenger in Smith's car had B.R.'s bank card in his pocket. B.R.'s silver chain was on the car's floorboard. When shown a photographic lineup, U.R. identified Smith as looking similar to one of the men who approached them at the concert, although he was not sure of the identification.

Second, Andrew M. attended the concert with Samantha V. When Andrew was in the restroom washing his hands, a man, whom Andrew later identified as Smith, approached him from behind and pressed something that felt like a gun into his waist. Smith grabbed Andrew's gold neck chains and

6

said, "Give me everything you have." Andrew lifted Smith onto his back "piggyback" style, and carried Smith out of the restroom to the swimming pool area. After Andrew set Smith on the ground, a group of men attacked Andrew, with kicks and punches that fractured one of his vertebrae. The group then rolled Andrew into the swimming pool while ripping the chains off his neck. They also took Andrew's iPhone and wallet. Samantha's iPhone was grabbed out of her hand during the incident.

Samantha recognized the case for her iPhone as among the items found in Smith's car when it was searched on August 19, 2018. Andrew's gold chains were pawned by Smith's friend, whom Smith drove to a pawnshop on the day after the robbery.

When Smith testified, he admitted to having attended the concert on August 18, 2018. However, Smith stated that he did not have any involvement in the robbery of Samantha V. and Andrew M. Regarding the robbery of B.R., Smith stated that he did not participate in the robbery and assault, but rather he intervened to stop the assault and to help B.R. get up off the ground.

e. *The Robbery of Benjamin G. on September 16, 2018*

On September 16, 2018, Benjamin G. was standing in the living room of an apartment during a party when a man came up and grabbed his iPhone out of his hands. A second man, whom Benjamin identified as Smith, stepped in front of Benjamin to block him from going after the man who took the phone. Smith said to Benjamin, "Back up, back up, get the fuck back, he's got a gun, get the fuck back." Referring to the man who took the phone, Smith

said, "I know him, he's crazy, he has a gun, he's crazy."[3]  Benjamin perceived that Smith was "essentially defending" the phone thief from him.  Benjamin was scared and decided not to take any chances by going after his phone. Instead, Benjamin told the host of the party about the theft, and the thief left the party with Benjamin's phone.

Smith testified that he had no connection to Benjamin's robbery.

### f. *The Robbery of Manuel P. and His Sister on September 18, 2018*

On September 18, 2018, Manuel P. and his sister arranged to meet someone outside a Starbucks to sell Manuel's iPhone.  A man, whom both Manuel and his sister later identified as Smith, approached with two other men and asked if they were selling a phone.  Smith examined the phone that Manuel was offering for sale and then took it and started to leave.  Manuel's sister grabbed the phone to try to stop Smith from leaving with it, but Smith ripped the phone from her hands, hitting her mouth with the phone while doing so.  One of the other men hit Manuel in the back of the head.  The men ran to a car in an alley, and Manuel's sister chased them, making note of the license plate number.

In a video found on Smith's cell phone, Smith is shown wearing the same black sweatshirt as the person shown on the Starbucks surveillance video taking the phone from Manuel.  On October 2, 2018, Smith was arrested as a passenger in the car that the robbers used to leave from the

---

[3]    At trial, one of Benjamin's companions at the party stated that two different men stepped forward to prevent Benjamin from going after the phone thief, although only one of the men said anything.  Benjamin, in contrast, described only a single person, namely Smith, as stepping forward to stop him.

Starbucks robbery. Smith testified that he was involved in the Starbucks robbery only as the getaway driver.

B.    *The Proceedings Against Smith*

An information charged Smith with 13 counts of robbery (§ 211), four counts of burglary (§ 459), four counts of grand theft (§ 487, subd. (a)), and two counts of using personal identifying information of another (§ 530.5, subd. (a)). For one of the robbery counts, it was alleged that Smith personally inflicted great bodily injury. (§§ 1192.7, subd. (c)(8), 12022.7, subd. (a).) For the robbery count in which Benjamin G.'s iPhone was taken (count 21), it was alleged that Smith committed the robbery while acting in concert with two or more other persons and that the offense was perpetrated in the inhabited portion of a building. (§ 213, subd. (a)(1)(A).) The jury found Smith guilty of each of the counts as alleged, with the exception that it made a "not true" finding on the allegation that Smith acted in concert with two or more persons in committing the robbery of Benjamin G. in count 21.

Smith was sentenced to prison for a term of 21 years, four months. The trial court ordered Smith to pay a $6,900 restitution fine (§ 1202.4, subd. (b)), a $41 theft fine (§ 1202.5), a $920 court operations assessment (§ 1465.8), a $690 criminal conviction assessment (Gov. Code, § 70373), and a $154 criminal justice administration fee (Gov. Code, § 29550.1). Smith was also ordered to pay $99,567 in direct victim restitution, jointly and severally with his co-perpetrators.

## II.

## DISCUSSION

A.    *There Is No Merit to Smith's Contention That the Trial Court Should Have Instructed With CALCRIM Nos. 375 and 316 Regarding Evidence That He Committed Other Uncharged Offenses*

Smith's first contention centers on the fact that, even though the jury heard evidence that Smith committed other uncharged offenses, the trial court did not instruct with CALCRIM No. 375 or CALCRIM No. 316.

CALCRIM No. 375 instructs the jury of the limited use that the jury may make of evidence of a defendant's uncharged criminal conduct.[4] CALCRIM No. 316 instructs the jury about how to apply the fact that a witness has committed a crime in evaluating the witness's credibility.[5]

---

[4] Because of its length we do not set forth the entire text of CALCRIM No. 375. Instead, summarizing the instruction, we note that it opens with a sentence in which the jury is told that it heard evidence that the defendant committed other offenses that were not charged in the instant case. The instruction then informs the jury that the defendant's uncharged offenses may be considered only if the People prove them by a preponderance of the evidence. It next specifies that evidence of the uncharged offenses may be used only for certain limited purposes, including, if relevant, for deciding identity, intent, motive, knowledge, accident, common plan and consent. The instruction concludes with the following:

> "[In evaluating this evidence, consider the similarity or lack of similarity between the uncharged (offense[s]/ [and] act[s]) and the charged offense[s].] [¶] Do not consider this evidence for any other purpose [except for the limited purpose of *<insert other permitted purpose, e.g., determining the defendant's credibility>*]. [¶] [Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.] [¶] If you conclude that the defendant committed the (uncharged offense[s]/ act[s]), that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of *<insert charge[s]>* [or that the *<insert allegation[s]>* has been proved]. The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt." (CALCRIM No. 375.)

[5] The relevant portion of CALCRIM No. 316 states, "If you find that a witness has committed a crime or other misconduct, you may consider that fact [only] in evaluating the credibility of the witness's testimony. The fact

10

1. *Relevant Proceedings*

The jury heard evidence regarding uncharged offenses committed by Smith at two different points during trial. First, as we have described, Smith admitted on cross-examination that he burglarized an Apple store in Orange County, during which he kicked an off-duty police officer in the face. Second, during the testimony of a detective who investigated Smith's crimes, the prosecutor asked whether she believed there were other victims of Smith's crimes that she was not able to identify during her investigation. The detective answered affirmatively. The prosecutor followed up by playing several videos, all taken on July 8, 2018, that were found on the cell phone of Smith's friend. One video shows Smith holding up several gold chains and an iPhone while he and his friend chant "chain gang, chain gang." Another video shows Smith with his friends, who are holding up iPhones. While they do so, Smith says, "I'm trying to keep the money in the circle." Smith's friend says, "Telekom looking very nice to us," referring to a store that buys iPhones. A third video shows Smith's friend talking about "beating on" people, stating that "[w]e got in like . . . twenty fights in less than an hour and a half," while Smith points to an injury on his own face.

The videos shown during the detective's testimony were the subject of a motion in limine filed by the People, in which they argued that the videos were admissible to show common plan, intent, motive and identity. In the course of discussing the motion in limine, the trial court commented that, in conducting an analysis under Evidence Code section 352, it did not think that

that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." (CALCRIM No. 316.)

11

the videos were unduly prejudicial for several reasons, including that the jury could be instructed that the evidence was to be used only for a limited purpose.[6] Then, after viewing the videos and hearing additional argument from counsel, the trial court ruled that the videos were admissible. During trial, defense counsel renewed his objection to the admissibility of the videos based on Evidence Code section 352, and the trial court again overruled the objection.

In the course of proposing jury instructions, defense counsel did not request that the jury be instructed either with CALCRIM No. 375 or CALCRIM No. 316. However, after Smith testified about the burglary of the Apple Store in Orange County and the prosecutor mentioned that admission during closing argument, the trial court raised the possibility of instructing with CALCRIM No. 375. The trial court told the prosecutor, "I'd like you to consider at least and prepare for the court's consideration a tailored version of 375 of the CALCRIM, uncharged offenses. That relates to the [Orange County] incident. Now, the use notes in the cases . . . hold that I don't have a sua sponte duty to instruct, give that instruction, and it has not been requested of me. And [this is] not a case where the whole case turns on that evidence of uncharged crimes. But I still think I should consider giving it."

---

6    The court stated, "I'm not sure I see the undue prejudice part of the calculus. And if you're concerned about–also, I'm not sure I think this is hearsay because I'm not sure it's offered for the truth. But even if it is, I could certainly, could fashion a limited instruction, because in most cases it's applicable. 303 of the CALCRIM says some evidence may be received, but the court will consider it only for the limited purpose. And in this case, there's a separate CALCRIM instruction about that. I'm not sure these are uncharged offenses. But at any rate, you can't consider this to prove propensity to commit a crime. It has to have other independent significance. So I think the jury instructions could adequately advise the jurors."

12

Following up, the court commented, "I just think we should give the jury some guidance on the limited purpose for which they can consider that evidence," and said that although "the defense did not request it, . . . I just wonder if I don't have some responsibility."

The prosecutor responded to the trial court's request by suggesting that instead of instructing with CALCRIM No. 375, Smith's testimony about the Orange County burglary could be addressed by including additional optional language in CALCRIM No. 226, which instructs the jury on how to evaluate witness testimony. Specifically, the prosecutor proposed to include a phrase stating that in evaluating a witness's credibility the jury may consider whether "the witness engaged in other conduct that reflects on his or her believability."[7] The trial court then commented, "[M]aybe that's the best way to handle it then," and asked whether defense counsel had any thoughts on the matter. Defense counsel replied, "No. We discussed this earlier, Your Honor, and I'll submit it to you."

2.  *The Argument That the Trial Court Should Have Instructed With CALCRIM Nos. 375 and 316 Is Forfeited*

Smith contends that the trial court prejudicially erred by not instructing with CALCRIM Nos. 375 and 316 in light of the videos suggesting he committed other uncharged crimes involving gold chains and iPhones, and in light of his testimony admitting that he burglarized the Apple store in Orange County. As we will explain, however, Smith has forfeited the ability to advance that argument on appeal because it was not raised in the trial court.

_____

[7]  During the discussion, the prosecutor and the trial court referred to CALCRIM No. 225, but based on the context, it appears that they intended to refer to CALCRIM No. 226.

13

Except in an exceptional circumstance, a trial court does not have a sua sponte duty to give instructions, such as CALCRIM Nos. 375 and 316, which inform the jury of the limited use it can make of a defendant's other bad acts. (*People v. Hawkins* (1995) 10 Cal.4th 920, 942 ["the trial court has no [sua sponte] duty to provide limiting instructions regarding evidence of past criminal conduct, either of uncharged criminal activity or of prior convictions"]; *People v. Collie* (1981) 30 Cal.3d 43, 63-64 (*Collie*); *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052.) As our Supreme Court has explained, a sua sponte duty may arise only in the "occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence." (*Collie,* at p. 64.)

Smith concedes in his opening brief that "the trial court did not have a *sua sponte* duty to provide either CALCRIM No. 375 or CALCRIM No. 316 to the jury." We concur. No sua sponte duty arose because the evidence of Smith's uncharged offenses was not particularly significant to proving Smith's guilt in light of the other evidence against him. Specifically, Smith *admitted* that he committed burglaries of four Apple stores as charged in this case, and his culpability for each of the robberies charged in this case was established by eyewitness testimony, recovered stolen property, surveillance video and cell phone video recordings. Thus, the evidence suggesting that Smith also committed uncharged crimes was not "so obviously important to the case" that the trial court had a sua sponte duty to instruct the jury on the

14

limited use it could make of those uncharged crimes. (*Collie, supra,* 30 Cal.3d at p. 64.)

When a trial court lacks a sua sponte duty to give a limiting instruction, and the defendant does not request that the trial court do so, the defendant forfeits his ability to argue on appeal that the trial court erred by not giving the instruction. (*People v. Clark* (2011) 52 Cal.4th 856, 942; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246.) Here, defense counsel did not request that the jury be instructed with CALCRIM No. 375 or CALCRIM No. 316, even though the trial court gave him ample opportunity to do so and even raised its own concern that such an instruction was warranted. Accordingly, Smith has forfeited the ability to argue on appeal that the trial court was required to instruct with CALCRIM Nos. 375 and 316.

3.    *Smith Has Not Established That He Received Ineffective Assistance of Counsel*

Smith argues that in the event we conclude defense counsel's failure to request CALCRIM Nos. 375 and 316 resulted in forfeiture, he is nevertheless entitled to relief because he received ineffective assistance of counsel.

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Doolin* (2009) 45 Cal.4th 390, 417.) To establish ineffective assistance, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) An ineffective assistance of counsel claim fails if the defendant makes an insufficient showing on either one of these

15

components.  (*Strickland*, at p. 687.)  "It is defendant's burden to demonstrate the inadequacy of trial counsel."  (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding."  (*Mai, supra*, 57 Cal.4th at p. 1009.)  "[W]e begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.'  [Citation.]  Accordingly, [our Supreme Court has] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had 'no rational tactical purpose' for an action or omission."  (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).)

Here, defense counsel failed to request limiting instructions that would have informed the jury that although it heard evidence of other uncharged offenses committed by Smith, it could only make limited use of that evidence.  CALCRIM No. 375 would have informed the jury that the evidence of uncharged offenses could be used only to show common plan, intent, motive and identity.  CALCRIM No. 316 would have reminded the jury that the fact that Smith may have committed other crimes does not necessarily destroy or impair his credibility.

Smith's claim of ineffective assistance of counsel fails because he cannot show that defense counsel "had no rational tactical purpose" for

16

failing to request the instructions. (*Mickel, supra*, 2 Cal.5th at p. 198.) Specifically, defense counsel reasonably could have concluded that the best strategy was to minimize the evidence of Smith's uncharged offenses as much as possible by omitting any mention of them in a jury instruction, and by not reminding the jury that those uncharged offenses could be used to show common plan, intent, motive and identity. (Cf. *Hawkins, supra*, 10 Cal.4th at p. 942 ["[a] reasonable defense counsel may have concluded that the risks of issuing a limiting instruction . . . was not worth the questionable benefits such instruction would provide"]; *People v. Freeman* (1994) 8 Cal.4th 450, 495 [failure to request limiting instruction on evidence of defendant's prior crimes was not ineffective assistance because trial counsel "may well not have desired the court to emphasize the evidence"]; *People v. Hinton* (2006) 37 Cal.4th 839, 878 ["Defendant also complains that counsel's failure to request a limiting instruction concerning his prior murder conviction demonstrated ineffective assistance, but counsel may have deemed it unwise to call further attention to it."].) Defense counsel could have concluded that it was especially risky to remind the jury of the evidence appearing in the cell phone videos, which suggested that Smith committed uncharged crimes where iPhones and gold chains were taken. Focusing the jury on that evidence would have undermined the credibility of Smith's testimony that he was not directly involved in any of the robberies charged in this case.

In short, because defense counsel could have had a rational tactical basis for failing to request CALCRIM No. 375 and CALCRIM No. 316, Smith has not succeeded in establishing that he received ineffective assistance of counsel.

B. *Smith's Challenge to Certain Language in CALCRIM No. 315 Is Forfeited and Lacks Merit*

17

We next consider Smith's argument that his federal and state due process rights to a fair trial were violated by certain language appearing in CALCRIM No. 315, which instructs the jury on how to assess identifications made by an eyewitness. Specifically, Smith challenges the portion of CALCRIM No. 315 that directs the jury to consider "[h]ow certain was the witness when he or she made an identification?" (CALCRIM No. 315.) According to Smith, this portion of the instruction "directed the jury to consider an inaccurate and scientifically debunked correlation between a witness's certainty and the accuracy of his or her identification" and accordingly "rendered [his] trial fundamentally unfair" and "violated his state and federal due process rights."

Smith's argument fails for two reasons. First, Smith did not challenge the relevant language in the trial court. As our Supreme Court has explained, a defendant's failure to request a modification of an instruction on eyewitness certainty in the trial court forfeits the ability to challenge the instruction on appeal. (*People v. Sánchez* (2016) 63 Cal.4th 411, 461-462 [with respect to a challenge to the witness certainty language in the predecessor instruction to CALCRIM No. 315, the defendant's challenge to the inclusion of the certainty language was forfeited because the defendant did not request a modification of the instruction].) A finding of forfeiture is especially appropriate where, as here, inclusion of the language on eyewitness certainty might have been beneficial to the defendant in that the evidence "involved many identifications, some certain, some uncertain," and "[d]efendant would surely want the jury to consider how *uncertain* some of the identifications were." (*Id*. at p. 462.)

Second, while this appeal was pending, our Supreme Court issued

18

*People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), which rejects the precise argument presented by Smith. In *Lemcke*, when considering a due process challenge to the witness certainty language in CALCRIM No. 315, our Supreme Court found it significant that the defendant was able to present expert evidence about eyewitness identification, and that the jury was instructed that " '[p]eople sometimes honestly . . . make mistakes about what they remember,' " and that it was responsible for " 'judg[ing] the credibility or believability of the witnesses.' " (*Id.* at p. 658.) Further, *Lemcke* noted that in the instruction on eyewitness identification, the jury was instructed that " '[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty.' " (*Ibid.*) In that context, our Supreme Court held "listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id.* at p. 661.)[8]

Here, where Smith, like the defendant in *Lemcke*, was free to present his own expert evidence on eyewitness identification and the jury was given the specific instructions on witness testimony and the burden of proof that our Supreme Court in *Lemcke* found to be significant in alleviating any due process problem, there is no merit to Smith's contention that his right to due

---

[8] Although not relevant to our evaluation of Smith's argument, we note that our Supreme Court in *Lemcke* stated that it "believe[s] there is a risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy," and it thus "direct[ed] . . . trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Lemcke, supra*, 11 Cal.5th at p. 669.)

process was violated by the inclusion of language regarding witness certainty in CALCRIM No. 315.

C. *Substantial Evidence Supports Smith's Conviction for the Robbery of Benjamin G.*

Smith next challenges the sufficiency of the evidence to support his conviction for the robbery of Benjamin G. in count 21. As we have explained, Benjamin was standing in the living room of an apartment during a party when a man grabbed his iPhone out of his hands. Smith then placed his body between Benjamin and the man who took the phone, telling Benjamin to "get the fuck back" and stating that the man who took Benjamin's phone was crazy and had a gun.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60, citations omitted.)

Smith's first contention is that the evidence may support a finding that he aided and abetted a *theft* of Benjamin's phone, but it is insufficient to support a conviction for *robbery*. Smith's argument is premised on the principle that the crime of robbery requires that property be taken *by force or fear*. (§ 211 ["Robbery is the felonious taking of personal property in the

20

possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."].)[9]  Referring to the man who took the phone from Benjamin, Smith argues that because "[t]here is no evidence that the perpetrator used force to take the phone," "[b]y simply snatching the phone from [Benjamin], the perpetrator in this case committed a theft, not a robbery."  Smith argues that, accordingly, to the extent that his participation in the incident "constituted aiding and abetting, it was aiding and abetting a *theft*.  It was not aiding and abetting a *robbery*."  (Italics added.)

This argument fails because it ignores case law establishing that two people acting together can *collectively* satisfy the elements of a crime. " 'When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator.'  [Citation.]  The aider and abettor 'is liable for another's actions as well as that person's own actions. When a person "chooses to become a part of the criminal activity of another, she says in essence, 'your acts are my acts . . . .' "  [Citation.]  But that person's *own* acts are also her acts for which she is also liable.' "  (*People v. Delgado* (2013) 56 Cal.4th 480, 489.)  Here, the man who grabbed Benjamin's phone supplied *some* of the elements of robbery, because he took personal property in the possession of another, from the victim's person or immediate presence, and against the victim's will.  (§ 211.)  However, as we will explain, Smith's conduct supplied the *remaining* element of robbery because it allowed the taking to be accomplished through *force or fear*.

---

[9]    The type of force that will support a conviction for robbery is "some quantum of force in excess of that 'necessary to accomplish the mere seizing of the property.' "  (*People v. Anderson* (2011) 51 Cal.4th 989, 995.)

Smith's conduct added the element of force or fear to the robbery because " '[a] robbery is not completed at the moment the robber obtains possession of the stolen property. The crime of robbery includes the element of asportation, the robber's escape with the loot being considered as important in the commission of the crime as gaining possession of the property. . . . [A] robbery occurs when defendant uses force or fear in resisting attempts to regain the property or in attempting to remove the property from the owner's immediate presence regardless of the means by which defendant originally acquired the property.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 686-687.) In this case, the evidence supports a finding that, during asportation, Smith used fear to prevent Benjamin's attempts to regain possession of his phone. As Benjamin testified, Smith used profanity in telling him to "get the fuck back" and then told Benjamin that the man who took the phone was crazy and had a gun. According to Benjamin, Smith's actions and statements made him feel scared, and he decided that he would not go after his phone. In short, Smith caused Benjamin to be afraid, and the man who took the phone was able to escape with it. Therefore, when the acts of Smith and his co-perpetrator are considered together, substantial evidence supports a finding that Smith participated in a robbery of Benjamin, not just a theft, because he supplied the element of force or fear.

Next, Smith argues that insufficient evidence establishes that he and the man who took Benjamin's phone "were working together" and "shared a common intent to rob Benjamin." We disagree. The scenario described in Benjamin's testimony provides substantial evidence to support a finding that Smith and the man who took the phone were working together to use fear to deprive Benjamin of his property. A reasonable trier of fact could infer that by stepping in front of Benjamin, while telling him to "get the fuck back" and

22

warning him that the man who took the phone had a gun and was crazy, Smith was intentionally participating in a coordinated effort to instill fear to enable his co-perpetrator to escape with Benjamin's phone. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409-410 [when defendant's companion pulled out a gun in an attempted robbery, the evidence supported a finding that the defendant "played an affirmative supportive role in the attempted robbery and was not simply an innocent, passive, and unwitting bystander" because the two men engaged in concerted action, including the defendant positioning himself in front of the victims in order "to intimidate and block them, divert suspicion, and watch out for others who might approach," and then forcibly preventing one of the victims from leaving while his companion chased after the other victim].) Indeed, as Benjamin explained during his testimony, that was precisely his understanding of the situation, as he perceived that Smith was "essentially defending" the phone thief. Significantly too, the jury heard ample evidence of other instances in which Smith worked together with other men to carry out robberies. The jury reasonably could have relied on that evidence to infer that when Smith stepped in front of Benjamin after another man grabbed Benjamin's phone, Smith was intentionally participating in collective criminal conduct.

Finally, Smith argues that insufficient evidence supports a finding that he was guilty of robbing Benjamin because the jury made a "not true" finding on the allegation that Smith committed the robbery "while voluntarily acting in concert with two or more other persons and the offense was perpetrated in the inhabited portion of any building" (the robbery-in-concert allegation). According to Smith, this finding shows that the jury could not have found that he "intended to assist the thief in taking the phone with force or fear." We reject the argument for two reasons.

First, the jury's "not true" finding on the robbery-in-concert allegation is fully consistent with the jury's finding that Smith participated in the robbery of Benjamin. This is because the robbery-in-concert allegation required a finding that Smith acted in concert with *two or more* persons. Benjamin described only two people who committed the robbery: Smith and the person who took the phone. That evidence does not support a true finding on the robbery-in-concert allegation because Smith did not act *together with two or more persons*, but it does support a finding that Smith acted together with *one other person* to commit a robbery.

Second, even were we to conclude that there was any inconsistency in the jury's finding on the robbery-in-concert allegation and the verdict of guilt in count 21, "inconsistent verdicts are allowed to stand." (*People v. Lewis* (2001) 25 Cal.4th 610, 656 ["It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand. . . . [¶] We have conducted an independent review of the record and . . . have determined there is sufficient evidence to support the convictions and findings rendered in this case. Thus, even if we assume for argument's sake that the jury verdicts were inconsistent, that conclusion does not, of itself, warrant reversal."].) We are accordingly not required to conclude, based on any inconsistencies in the verdict, that insufficient evidence supports the jury's finding that Smith committed the robbery of Benjamin.

In sum, Smith has not established that insufficient evidence supports his conviction for the robbery of Benjamin G. in count 21.

D.    *Smith Forfeited His Contention That He Is Entitled to a Hearing on His Ability to Pay the Fines and Fees Imposed at Sentencing*

At sentencing, the trial court imposed a restitution fine in the amount of $6,900 (§ 1202.4, subd. (b)); a court operations assessment in the amount of $920 (§ 1465.8); a theft fine in the amount of $41 (§ 1202.5); a criminal

conviction assessment fee in the amount of $690 (Gov. Code, § 70373); and a criminal justice administration fee in the amount of $154 (Gov. Code, § 29550.1).

Smith contends that based on his constitutional right to due process, he should be given an opportunity to challenge his ability to pay the fines and fees. Smith requests that we remand this matter with directions that the trial court hold a hearing on his ability to pay.

In support of the relief he seeks, Smith relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) and subsequent cases that apply it. *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373" and that, "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.) Numerous subsequent cases have addressed the issues presented in *Dueñas*, and the validity of *Dueñas* will be decided by our Supreme Court in currently pending cases. (E.g., *People v. Kopp*, 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

*Dueñas* was filed January 8, 2019. (*Dueñas, supra*, 30 Cal.App.5th 1157.) Smith's sentencing hearing occurred more than a year later on March 13, 2020. Accordingly, by the time that Smith was sentenced, the issues discussed in *Dueñas* were widely known and were already pending before our Supreme Court. Nevertheless, during Smith's sentencing, defense counsel

25

did not raise the issue of Smith's ability to pay the fines and fees and did not request a hearing on that issue.

The People contend that Smith has forfeited any right he may have to seek a hearing on his ability to pay because he failed to raise it in the trial court during sentencing. " ' " '[A] constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " ' " (*People v. McCullough* (2013) 56 Cal.4th 589, 593.) "The concept of forfeiture for failure to raise ability to pay fines, fees or assessments is well established in our caselaw prior to *Dueñas*." (*People v. Keene* (2019) 43 Cal.App.5th 861, 864.) After *Dueñas* was decided, some courts concluded that despite the general forfeiture rule, the defendant had not forfeited the ability to ask the appellate court for relief under *Dueñas* because *Dueñas* was not foreseeable based on existing law at the time of the sentencing hearing. (See, e.g., *People v. Castellano* (2019) 33 Cal.App.5th 485, 489; *People v. Johnson* (2019) 35 Cal.App.5th 134, 137-138; but see, e.g., *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1154 [concluding forfeiture applied].)

In this case, however, there is no basis for Smith to avoid the forfeiture rule that applies when a defendant fails to raise a challenge at sentencing to the ability to pay fines and fees. Whether or not the holding of *Dueñas* was foreseeable, by the time of Smith's sentencing hearing, *Dueñas* was a well-known and often-cited opinion. Accordingly, because Smith did not raise a challenge to his ability to pay the fines and fees in the trial court, even though authority supporting such a challenge already existed, Smith forfeited his ability to argue on appeal that we should remand to the trial court to hold a hearing on his ability to pay.

26

Smith argues that in the event we conclude he has forfeited any right to a hearing on his ability to pay, we should nevertheless grant him relief because he received ineffective assistance of counsel. To demonstrate that counsel provided ineffective assistance, Smith must show that counsel's representation was deficient and resulted in prejudice. (*Strickland, supra,* 466 U.S. at p. 694.) On direct appeal, we may conclude that counsel's representation was deficient "only if there is affirmative evidence that counsel had 'no rational tactical purpose' for an action or omission." (*Mickel, supra*, 2 Cal.5th at p. 198.) Smith was prejudiced if there is a reasonable probability he would have received a more favorable result had counsel provided adequate representation. (*Strickland*, at p. 694.)

Smith has not demonstrated that defense counsel lacked a rational tactical purpose for failing to object to the fines and fees, as it is not clear from the appellate record whether counsel believed that Smith did not have the financial resources to pay them. Without further evidence in the record about both Smith's financial condition and defense counsel's knowledge on that issue, we cannot determine on direct appeal whether defense counsel may have made a rational tactical decision that it would have been futile to argue that Smith lacked the ability to pay.[10] Further, on the issue of prejudice, because the record contains no information about Smith's financial resources, we are unable to assess whether Smith would have been able to show an inability to pay the fines and fees. We therefore cannot conclude, on

---

[10]    Smith points out that the probation officer's report states that he was unemployed and had no income. However, Smith overlooks the fact that although he may not have been employed, he was involved in committing crimes that resulted in him wrongfully obtaining a substantial amount of money and property. The record does not reflect whether those assets may be available to Smith to satisfy his fines and fees.

this record, that any prejudice resulted from defense counsel's failure to raise the issue.

## DISPOSITION

The judgment is affirmed.


                                                                    IRION, J.

WE CONCUR:




HALLER, Acting P. J.




GUERRERO, J.